```
                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
                        WESTERN DIVISION
```

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | NO. 1:11-CR-00065 |
|  | : |  |
| v. | : |  |
|  | : | **OPINION AND ORDER** |
| SHALABY KEYS. | : |  |

This matter is before the Court on Defendant's Motion to Suppress (doc. 21), the government's Response (doc. 23), and Defendant's Reply (doc. 25). The Court held a hearing on this matter on August 3, 2011. For the reasons indicated herein, the Court DENIES Defendant's Motion.

**I.  Background**

Defendant, who has been charged as a felon in possession of a firearm, moves to suppress the evidence of a firearm as well as statements he made to police officers prior to any Miranda warnings during his detention on April 20, 2011 (docs. 21, 25). Defendant offers a version of events in which it appears he was simply walking down East Clifton Avenue, in Cincinnati's Over-the-Rhine neighborhood, when he was stopped without any reasonable suspicion (Id.). Because Defendant contends his stop was not justified under Terry v. Ohio, 392 U.S. 1 (1968), he contends all the evidence the officers found after such stop should be suppressed (Id.).

At the August 3 hearing on Defendant's motion, the government called Cincinnati Police Officer Jacob Wloszek, the officer who stopped Defendant, and elicited Wloszek's testimony concerning the stop and detention of Defendant. In an effort to impeach Wloszek's testimony regarding the clothing Defendant was wearing when he was stopped, Defendant elicited testimony from Josephine Diatta Griffith, the property clerk at the Hamilton County Sheriff's Office.

The Court has reviewed the parties' arguments in their briefing and at the hearing, as well as assessed the testimony of Officer Wloszek. As such, the Court is now ready to render its decision in this matter.

**II.  The Fourth Amendment**

Governmental detentions of persons, including arrests, constitute seizures, and as such must be reasonable under the Fourth Amendment. Similarly, evidentiary searches and seizures must be reasonable to be valid under the Fourth Amendment.

There are essentially three types of encounters that can occur between a citizen and a police officer: a consensual encounter, an investigative Terry-type stop, and an arrest. See United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989). A consensual encounter can occur without any suspicion or justification, while an arrest can take place only if the police have probable cause to believe the individual has committed or is

2

committing a crime.  Beck v. Ohio, 379 U.S. 89 (1964).  The investigative stop falls on the continuum between these two, and allows for police to briefly detain a person for investigative purposes even if they lack probable cause to make an arrest.

In Terry, the officer observed two individuals pacing back and forth in front of a store, peering into the window, and periodically conferring.  392 U.S. at 5-6.  The conduct observed was lawful, but it also suggested the individuals were casing the store for a planned robbery.  The Terry decision recognized that the officer could detain the individuals to resolve the ambiguity. 392 U.S. at 30.

To make an investigative stop, police must have reasonable suspicion supported by articulable facts that criminal activity may be afoot.  United States v. Sokolow, 490 U.S. 1, 7 (1989).  If the police also have a reasonable suspicion to believe that the detainee is armed and dangerous, they may also conduct a "frisk," a limited search, to ensure the detainee has no weapons. Terry, 392 U.S. at 24, Adams v. Williams, 407 U.S. 143, 146 (1972).

In reviewing the legality of Terry stops, courts must consider the "totality of the circumstances" of each case, so as to determine whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing."  United States v. Arvizu, 534 U.S. 266, 273 (2002).  Relevant to the totality of the circumstances are various factors, such as whether the stop

3

occurred in a high-crime area, Illinois v. Wardlow, 528 U.S. 119, 124 (2000), or whether the suspect engaged in evasive behavior or acted nervously, Id., United States v. Brigoni-Ponce, 422 U.S. 873, 885(1975), United States v. Sokolow, 490 U.S. 1, 8-9 (1989).

A determination whether reasonable suspicion exists must give due weight to common sense judgments reached by officers in light of their experience and training. Arvizu, 534 U.S. 266, 273 (2002)(officers draw on their experience and training to make inferences from and deductions about cumulative information available to them), United States v. Carthorn, No. 93-6593, 1994 U.S. App. LEXIS 24582, *15 (6th Cir. September 8, 1994) (per curiam)(finding reasonable suspicion based on Defendant's presence in the back seat of a car in a known drug area at 4:00 A.M. and due to the fact that the officer had made previous arrests at the same location), United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2003)(noting that the officer's familiarity with the high crime and drug trafficking nature of the neighborhood were important factors in the reasonable suspicion analysis).

In permitting such detentions, the law accepts the risk that officers may stop the innocent. Wardlow, 528 U.S. at 126. "Indeed the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent," states the Wardlow court, "The Terry stop is a far

more minimal intrusion, simply allowing the officer to briefly investigate further." Id.

To be reasonable under the Fourth Amendment, most searches must be pursuant to a warrant. However, there are a number of exceptions, including those under the "plain view" doctrine. Such doctrine allows for the seizure of evidence whose incriminating character is immediately apparent when the officers have a lawful right of access to the object. Horton v. California, 469 U.S. 128, 136-37 (1990).

### III. Officer Wloszek's Testimony

Although the government has raised arguments concerning Defendant's standing in this matter, the Court will first review the testimony of Cincinnati Police Officer Jacob Wloszek ("Wloszek"). Such testimony provides a context within which the Court can properly analyze the government's arguments, which it does in Section V., below.

Wloszek testified that he has been employed by the Cincinnati Police Department for seven years, in various capacities including as a uniformed patrol officer, as an officer in the vice control section, and as an officer in the homicide unit. According to his testimony for two-and-a-half years he patrolled the Over-the-Rhine neighborhood, while in vice control he spent about a quarter of his time there, and the first homicide he investigated was on East Clifton Avenue. Wloszek testified the area on East

5

Clifton is "a high crime area associated with a lot of drug-related violence and gang violence."

Wloszek testified that on April 20, 2011, he and his partner, Officer Schrage, were in uniform in a marked police cruiser patrolling the Over-the-Rhine neighborhood on uniform detail for the Over-the-Rhine Chamber of Commerce.  In such capacity, Wloszek testified that his responsibility in such off-duty capacity is to increase police visibility in the neighborhood, with the intent to reduce crime.

On this particular evening, at 10:10 P.M., Wloszek testified that he turned onto East Clifton Avenue from Frintz Street, when he "immediately observed an individual standing at the edge of the sidewalk almost on the street, kind of looking up and down the street both ways."  Wloszek indicated he thought this looked suspicious, and that "[i]t looked like he was acting like a lookout."  Wloszek testified, "As we came into his view and the police car was fully on East Clifton, I saw him turn over his shoulder and it looked like he yelled out behind him. . .at that point I followed where that subject looked behind him.  As I looked past him I saw another individual kind of lean up into a corner of a building that is brushed up along some bushes."

Wloszek then stated he turned his focus on this second person who then "spins over his left shoulder with an underhand throwing motion, tosses an object."  Wloszek testified that "I kind

6

of follow the trajectory of his arm. I see the bushes move. So I determine that the object had to be heavy enough to move the bushes." Wloszek then testified that the subject then turned, "kind of almost like he jumps out of the bushes onto East Clifton and then turns. . .and starts walking there in a hurried fashion in the opposite direction of our police car."

Although it was night, Wloszek testified that the street was well-lit, and that when he first noticed a second individual, who he ultimately identified to be Defendant, they were about twenty to twenty-five yards away from each other. Wloszek further testified that he immediately told his partner that he wanted to stop Defendant, who Wloszek described as wearing a red shirt hanging out of dark clothing.

Wloszek stated he pulled his car up to Defendant and instructed Defendant that he wanted to talk. Wloszek indicated Defendant glanced back at the Officers, glanced back down East Clifton, and continued to walk.[1] Wloszek testified that he repeated his request, telling Defendant to stop. According to Wloszek, Defendant continued to proceed until "my partner at this

---

[1] Wloszek characterized Defendant as giving "target glances." Wloszek explained "we were taught early on in the academy that when you're. . .trying to engage a specific suspect as they're looking in specific areas and they are not paying attention to you and to commands that you're giving, that is some type of— they're targeting something, whether it be somebody to attack, somewhere to escape or subconsciously even where there's something they don't want you to look, they look in those same directions."

point exits the vehicle, gets up onto the sidewalk in a very like forceful manner says 'stop right now.'"

Wloszek testified that Defendant immediately complied, and Wloszek instructed his partner to handcuff Defendant immediately.  Wloszek stated Schrage did so, patted Defendant down, and sat Defendant down on the sidewalk.  Wloszek stated he then "went right back to the bush that I saw move and recovered a loaded revolver firearm."

Wloszek further testified that while he was walking toward the bush, Defendant was trying to address him "saying to me things along the line, 'Why are you messing with me?  You're just messing with me because you arrested me last time.'"  Wloszek indicated he thought Defendant was attempting to distract him, as Defendant did not talk to Wloszek until Wloszek walked toward the area where he ultimately recovered the firearm.

Wloszek's testimony reflects that he did not ask Defendant any questions, and that he did not hear his partner ask any questions.  The police report reflects that Defendant was extremely nervous and kept "asking. . .if we are stopping him because he is on federal parole for weapons possession."  Wloszek indicated that after he secured the firearm, he told Defendant that Defendant was arrested and placed him in the cruiser and took him to jail.

8

**IV. Property Clerk Griffin's Testimony**

Defendant called Hamilton County Sheriff's Office property clerk Josephine Diatta Griffith ("Griffith') to testify as to Defendant's clothing. Griffith showed the clothing that she has in custody, that was taken from Defendant on the night of his arrest, when he was issued jail clothing. The clothing was all dark-colored, and Griffith testified she had no record that Defendant had a red thermal undershirt. However, Griffith further testified that inmates are routinely allowed to keep their undershirts, so long as they are plain-colored.

**V. The Government's Arguments Regarding Standing and the Fourth Amendment**

As indicated above, the government argues that Defendant lacks standing to request suppression of the gun (doc. 23). The government relies on a line of cases in which defendants had no reasonable expectation of privacy in luggage, bags, or briefcases that the defendants claimed did not belong to them. United States v. Peters, 194 F.3d 692 (6th Cir. 1999), United States v. Frazier, 936 F.2d 262 (6th Cir. 1991). The reasoning in such cases is simple, "one who disclaims any interest in luggage thereby disclaims any concern about whether or not the contents of the luggage remain private." United States v. Tolbert, 692 F.2d 1041, 1045 (6th Cir. 1982)(quoting United States v. Miller, 589 F.2d 1117, 1131 (1st Cir. 1978). Under such principle, defendants have been found to lack standing to suppress the admissibility of contraband

9

discovered inside luggage.

The government's attempt to expand the principle applicable to disclaimed baggage into the proposition that a defendant has no standing to request suppression of abandoned property is not well-taken. The facts of this case simply are not on point or in line with the disclaimed bag cases. There is no search of luggage or a container in this case. Defendant here claims no expectation of privacy with regard to the gun, he simply claims he does not own it and that due to an improper detention he was mistakenly linked to the gun. A party has standing when they have a sufficient stake in a controversy, an injury-in-fact caused by conduct complained of, that can be redressed by the court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). Defendant here meets such requirements and has standing.

The government, citing United States v. Martin, 399 F.3d 750 (6th Cir. 2005), similarly argues that Defendant has no fourth amendment interest in the gun because he abandoned it. However, the facts from the government's view do not support such theory. In California v. Hodari D., 499 U.S. 621 (1991), the Supreme Court established the rule that the fourth amendment does not apply to anything one may abandon while fleeing the police in order to avoid seizure. Here however, taking the facts from the government's view, Defendant put the gun in the bush before any show of police authority and before any attempts by Defendant to avoid the police.

Although his actions were furtive and raised suspicion, he arguably never fled the officers and he quickly submitted to their authority moments after Officer Wloszek observed his behavior.  There was no chase.  Had Defendant been refusing to submit and in the course of fleeing when he put the gun in the bush, this case would be on all fours with Hodari and Martin.  But the fact pattern here is different.  Defendant has a fourth amendment interest in avoiding unreasonable seizures, and he is entitled to invoke such interest in challenging the conduct of the officers who seized him and then linked him to the gun.

**VI.  Analysis**

The Court must weigh a number of issues when making a credibility determination of a witness, including the witness's interest in the outcome of the case, his or her candor, and the extent to which he or she has been supported or contradicted by other credible evidence.  Courts have also weighed such factors as a witness's state of mind, strength of memory, and demeanor and manner on the witness stand.  Valdez v. Church's Fried Chicken, Inc., 683 F. Supp 596, 606 (W.D. Texas, 1988)(citing Heelan v. Johns-Manville Corp., 451 F. Supp. 1382, 1385 (D. Colo. 1978)).  In this case, the balance weighs clearly in the favor of accepting Officer Wloszek's version of the events as true.  The Court found Officer Wloszek's testimony impressive and in all ways material, consistent with the photographic and documentary evidence in the

11

record. Wloszek's memory was clear and he was an impeccable witness.

Defendant attempted to impeach Wloszek by noting that he was on off-duty detail for the Over-the-Rhine Chamber of Commerce, and that as such, he was motivated to make arrests. However, such theory is in no way supported by the evidence before the Court. In fact, it appears that Wloszek's duties on off-duty detail in no material way differed from those he performs while working for the City. Wloszek's testimony shows his principle duty in patrolling the neighborhood was to maintain a police presence that would discourage crime. Nothing in the record shows Wloszek had any incentive to make arrests other than when necessary.

Defendant further questioned Wloszek why he chose not to detain the first person he saw on the street, the apparent "lookout." In Defendant's view, it was unreasonable to detain a person who had, according to the Officer's testimony, abandoned a firearm, while not detaining an apparent conspirator who could have remained armed. The Court finds Defendant's argument based on mere speculation, and does not find Wloszek's testimony about his actions impeached by such argument.

Defendant also questioned the fact that Wloszek did not engage the "MVR" recording device in the cruiser he was driving so as to provide a video record of the encounter with Defendant. Defendant noted that Wloszek had been disciplined in the past for

12

turning off an MVR when another officer was involved in misconduct. In Defendant's view Wloszek's actions in this matter did not comport with Cincinnati Police Department policy.

Wloszek immediately acknowledged in his testimony his prior discipline related to disengaging an MVR. Wloszek further explained that the relevant policy provides that recordings are to be made "when practical," and that in quickly developing situations, as occurred here, it was not practical to do so. Wloszek essentially indicated he had no time to be fiddling with the camera device when his eyes were on the lookout, and then Defendant, in what amounted to a rapid succession of events. Wloszek further indicated that after Defendant was in custody in the back of the cruiser, he did turn the camera on.

The Court rejects Defendant's apparent contention that the lack of video evidence demonstrates Wloszek did not follow policy. Under the facts presented, it was not practical for Wloszek to engage the MVR so as to record the encounter and initial detention of Defendant.

Finally, in his Reply brief, Defendant indicates that there were a number of people, mostly black men in the area of the public park not far from the bush, and suggests that the officers stopped Defendant over the other men, because he did not flee the way they did. Defendant argues he was stopped only because "he was simply the accessible black man." Such argument is not supported

13

in any way by the record.  Wloszek's credible testimony was that the street was empty except for Defendant and the lookout.  There is absolutely no evidence of any other people fleeing.  The Court does not find such representation in the briefing well-taken.

All-in-all, the Court further finds Wloszek's actions with regard to Defendant reasonable and justified.  The record shows Wloszek has extensive experience in the neighborhood, and that he identified it as a high-crime area.  The record further shows his encounter came with Defendant at night, that he observed someone apparently acting as a lookout warn Defendant, that Defendant's motions suggested he was hiding something in the bush, which he saw move as if something had been dropped.  Wloszek identified that Defendant made "target glances," and that Defendant did not immediately comply with the request to talk.  Wloszek was therefore justified under the totality of the circumstances to conduct a <u>Terry</u> investigation.  <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000).  Moreover, under the circumstances where this took place in a high crime area at night, Wloszek was reasonable in having Defendant cuffed for a brief time while he went to search the bush.   <u>Houston v. Does</u>, 174 F.3d 809, 815 (6th Cir. 1999)(the use of handcuffs does not exceed the bounds of a <u>Terry</u> stop, so long as the circumstances warrant that precaution).  A <u>Terry</u> stop may ripen into an arrest through the passage of time or the use of force, <u>United States v. Sharpe</u>, 470 U.S. 675, 685-86 (1985), but

14

the facts here do not support the theory that Defendant's stop became an arrest at any time prior to the discovery of the gun in the bush.  Finally, there is no evidence that Defendant was in any way interrogated, or that his statements were anything other than voluntary.  The Court finds no <u>Miranda</u> issue here, and no basis to suppress Defendant's statements.

As a final matter, the Court agrees with the government's position in its briefing that even if the detention was unjustified, which it was not, the gun should be admissible because the officer's actions in detaining and arresting Defendant had nothing to do with the seizure of the evidence (doc. 23, <u>citing</u> <u>Hudson v. Michigan</u>, 547 U.S. 586, 592 (2006)).  The government argues the gun could not constitute "fruit of the poisonous tree" as the officers found the gun based on what Wloszek saw, independent of the arrest and detention of the Defendant.  The Court finds such reasoning correct.

**VII. Conclusion**

The Court squarely rejects the government's theory that Defendant lacks standing or Fourth Amendment interests to question his detention or the admissibility of the gun discovered in the bush.  However, having reviewed this matter, the Court finds the evidence shows the police action in relation to Defendant on April 20, 2011 was reasonable and justified.

Accordingly, the Court DENIES Defendant's Motion to

Suppress (doc. 21).

        SO ORDERED.

Dated: August 9, 2011    /s/ S. Arthur Spiegel
                                 S. Arthur Spiegel
                                 United States Senior District Judge